BOURBON MINI–MART, INC.
and Robert E. Wanemacher,
Appellants–Defendants,

v.

COMMISSIONER, INDIANA DEPART-
MENT OF ENVIRONMENTAL MAN-
AGEMENT, Appellee–Plaintiff.

No. 50A03–0307–CV–285.

Court of Appeals of Indiana.

April 7, 2004.

Patricia Polis McCrory, Harrison & Moberly, Indianapolis, IN, Attorneys for Appellants.

Steve Carter, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SHARPNACK, Judge.

Bourbon Mini–Mart, Inc., and Robert Wanemacher (collectively "Mini–Mart") appeal the trial court's grant of summary judgment to the Indiana Department of Environmental Management ("IDEM"). Bourbon Mini Mart, Inc. raises two issues, which we consolidate and restate as whether the trial court correctly applied Ind. Code § 13–7–20–19(b) in granting IDEM's motion for summary judgment. We affirm.

The relevant facts designated by the parties follow. Bourbon Mini–Mart, Inc. (the "Gas Station") is a gas station and convenience store owned by Robert Wanemacher ("Owner"). The Gas Station stored gasoline in underground storage tanks, and in February 1990, the Workmans and the Duffs (collectively "Homeowners"), who owned residential properties adjacent to the Gas Station, complained that an unknown substance had entered their properties causing vapors to collect in their basements.[1] The residences were evacuated, and the Northern Indiana Public Service Company ("NIPSCO") shut off the residences' utilities.

IDEM's Emergency Response Section responded and began an investigation of the Gas Station property. During the first week of the investigation, IDEM determined that there was a petroleum problem, which investigators noted was usually caused by leaking underground storage tanks. IDEM named Jill Stevens as the Project Manager of the Gas Station investigation, and during the week of March 5–9, 1990, Stevens was at the Gas Station property to "oversee the installation of monitoring wells for the purpose of finding any contaminants in the groundwater, in the soils, and [to try] to determine the source of the contamination." Appellant's Appendix at 60. IDEM installed seven monitoring wells on the Gas Station property, and three of the seven wells revealed a significant amount of contamination as well as strong odors of petroleum.

Stevens then contacted Owner, told him that the Gas Station was the source of the contamination, and asked him to proceed with cleanup. She also told Owner that it would cost approximately $50,000 to clean up the Gas Station property. However, Owner was reluctant to begin cleanup, contacted his environmental consulting firm,

---

1. Homeowners sued Mini–Mart for nuisance, trespass, and negligence alleging that Mini–Mart caused the contamination to their property. In 1996, a jury found Mini–Mart liable and awarded Homeowners $530,000. *See Bourbon Mini–Mart, Inc. v. Gast Fuel and Servs., Inc.*, 783 N.E.2d 253, 256 (Ind.2003).

and initiated his own investigation of the Gas Station property. Owner believed that the source of the contamination was a former Shell station; however, IDEM's investigation revealed, "the former Shell station could possibly have provided some of the contamination in that the groundwater may have flowed a little towards the west, but that for sure, [the Gas Station] was the main source." *Id.* at 109. Eventually, Stevens contacted Owner, and told him that because of the urgency of the situation, IDEM was not going to wait for the results of his investigation, it was planning to initiate cleanup, and it would attempt to recover the cleanup costs at a later date. Stevens, in her deposition testimony, said, "[w]e felt at IDEM that this problem warranted emergency action, urgent action, to protect the residents of the two homes." *Id.* at 83. IDEM installed two monitoring wells and began a program to pump and treat the contaminated ground water. IDEM also installed vent systems in the Homeowners' residences in order to vent the fumes out of their basements.

In late summer 1991, the Workmans complained to IDEM about vapors in and around their home, noting that they thought the vapors had worsened. Stevens took an air canister sample in the Workman's home that revealed "high levels of contaminants which were not in the groundwater which was being run through the air stripper." *Id.* at 308. In 1992, IDEM removed the groundwater pump and treat system "due to continued access and operational issues with the property owner." *Id.* at 315. In June 1993, IDEM installed a new system, which "utilized an air stripper for groundwater treatment" and "a bio-filter bed for air effluent treatment." *Id.*

In June 1991, IDEM brought an action against Mini–Mart to recover the clean-up costs. IDEM's complaint alleged, in part, that:

\* \* \* \* \*

6. [IDEM] demanded that [Mini–Mart] undertake corrective action with respect to the contamination emanating from the [Gas Station] property but [Mini–Mart] refused. On or about April 28, 1990, [IDEM] therefore took corrective action under the authority of P.L. 172—1987 Section 2(a) (a non-code section) by beginning the installation and operation of treatment systems for the groundwater. [IDEM] continues to operate this system.

\* \* \* \* \*

12. The corrective action taken in this case by [IDEM] was necessary, in [IDEM's] judgment, to protect human health and the environment. [IDEM] could find no owner or operator of the underground tanks who was capable of carrying out corrective action with respect to the release because all such owners and operators refused to do so. Moreover, the existing situation required prompt action by [IDEM] to protect human health and the environment due to the contaminated condition of the groundwater and the explosive nature of the contaminants as they reached and threatened to reach buildings in the area.

13. [IDEM] has expended funds in taking corrective action in this matter in the amount of One Hundred Sixty Thousand Dollars ($160,000) for which [Mini–Mart] is liable under IC 13–7–20–21.

\* \* \* \* \*

Wherefore, [IDEM] prays that [Mini–Mart] be ordered to reimburse [IDEM] for its costs for corrective action in the

amount of One Hundred Sixty Thousand Dollars ($160,000) plus all additional costs incurred by [IDEM].

*Id.* at 31–33.[2]

On June 13, 2002, IDEM filed a motion for summary judgment, alleging that it had incurred $1,443,503.40 in costs associated with the cleanup of the Gas Station property and that Mini–Mart was "liable for the 'actual costs' of any corrective action, and must undertake corrective action on site." *Id.* at 222. IDEM, relying upon Ind.Code § 13–23–13–8, argued that "[t]he costs for which the state is entitled to recover include costs for 'enforcement of this article' and 'expenses incurred by the state under section 8 of this chapter in recovering costs of corrective actions.'" *Id.* at 223.

Mini–Mart filed a cross-motion for summary judgment, alleging that IDEM was not entitled to recover costs under its complaint because IDEM had not satisfied the elements of Ind.Code § 13–7–20–19(b)(1)–(4). Mini–Mart added, "[t]he satisfaction of these elements is a condition precedent to recovery under I.C. 13–[7]–20–21, which is the foundation of IDEM's Complaint." *Id.* at 225–226.

The trial court, after a hearing, granted IDEM's motion for summary judgment and denied Mini–Mart's cross-motion for summary judgment. The trial court's judgment provided, in relevant part, that:

1. The Motion of plaintiff IDEM for summary judgment against [Mini–Mart] is GRANTED, and the Court now orders

 (a) by Declaratory judgment that the defendants are compelled to commence corrective action on the [Gas Station] property in compliance with applicable Indiana Code Sections and Indiana Regulations;

 (b) that the Court enters Declaratory Judgment against [Mini–Mart] for recovery of pending and future corrective action costs incurred by the State;

 (c) while the Court is aware that corrective action had amounted to claimed sum of approximately $1.5 million through the time of the Court's 1999 Order (including attorney fees), the Court does not have fresh figures as to the pending amount of costs. The Court now therefore directs the State by the Office of the Attorney General to submit by affidavit form its current statement of total costs for the entry of an identifiable judgment through a date certain, a figure which the Court believes is not currently available to it. The entry of

**2.** In 1997, Mini–Mart filed a third party complaint for indemnification against Gast Fuel and Services, Inc. ("Supplier"), and, in 1999, it filed a third party complaint for indemnification against Boardman Chevrolet, a dealership located near Mini–Mart. In 1999, Boardman Chevrolet and Supplier filed separate motions for summary judgment against Mini–Mart, and the trial court granted both motions. Mini–Mart appealed. On appeal, we affirmed in part and reversed in part. *See Comm'r, Ind. Dep't of Envtl. Mgmt. v. Bourbon Mini–Mart, Inc.*, 741 N.E.2d 361, 368, 372 (Ind.Ct.App.2000) (affirming the trial court's grant of Boardman Chevrolet's motion for summary judgment, reversing the trial court's grant of Supplier's motion for summary judgment, and holding that Mini–Mart could sue Supplier for the remediation costs incurred after July 1, 1991). Our supreme court granted transfer. *See Bourbon Mini–Mart, Inc. v. Gast Fuel and Servs., Inc.*, 783 N.E.2d 253, 256–257 (Ind.2003) (affirming in all respects except our holding that Mini–Mart could recover remediation costs caused by Supplier after July 1, 1991, and holding that "Mini–Mart may proceed against Supplier with respect to remediation costs incurred both prior to July 1, 1991, and after").

any such sum, the Court is aware, will require supplementation from time to time as further clean-up costs are incurred.

\* \* \* \* \*

While the Court could walk through each of the arguments of the parties concerning various procedural issues and technical steps required of the Commissioner on an item by item basis, it is probably more sufficient and appropriate for the Court to simply say that it concurs in the analysis submitted by the Indiana Attorney General's Office and adopts that reasoning in making its ruling for [IDEM].

*Id.* at 27–28.

The sole issue is whether the trial court erred by granting IDEM's motion for summary judgment. On appeal, the standard of review of a grant or denial of a motion for summary judgment is the same as that used in the trial court: summary judgment is appropriate only where the designated evidence shows that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Corr v. Am. Family Ins.,* 767 N.E.2d 535, 537–538 (Ind.2002). The moving party must designate sufficient evidence to eliminate any genuine factual issues, and once the moving party has done so, the burden shifts to the nonmoving party to come forth with contrary evidence. *Shambaugh & Son, Inc. v. Carlisle,* 763 N.E.2d 459, 460–461 (Ind.2002). The court must accept as true those facts alleged by the nonmoving party, construe the evidence in favor of the nonmoving party, and resolve all doubts against the moving party. *Id.*

Mini–Mart argues that the trial court interpreted I.C. § 13–7–20–19(b) [3] incorrectly and that IDEM failed to meet the prerequisites of I.C. § 13–7–20–19(b) to undertake corrective action. We will address each of Mini–Mart's arguments separately.

### A.

The first issue is whether I.C. § 13–7–20–19(b) was written in the conjunctive or the disjunctive. I.C. § 13–7–20–19(b) (1990) provided that:

The commissioner, under rules adopted under section 13 of this chapter, may undertake corrective action with respect to any release of a regulated substance into the environment from an underground storage tank if that action is necessary, in the judgment of the commissioner, to protect human health and the environment, and:

(1) no person can be found within ninety (90) days after a suspected or confirmed release is identified (or a shorter period of such length as may be necessary to protect human and the environment) who is:

(A) an owner or operator of the underground storage tank;

(B) subject to the rules concerning corrective action; and

(C) capable of properly carrying out corrective action with respect to the release;

(2) an existing situation requires prompt action by the commissioner under this subsection to protect human health and the environment;

**3.** In 1996, the legislature amended Ind.Code § 13–7–20–19, and this section is now found at Ind.Code § 13–23–13–2. *See* Pub.L. No. 172–1987, § 1 (Approved April 16, 1987). IDEM filed its complaint against Mini–Mart

in 1991, prior to the legislature's recodification of I.C. § 13–7–20–19, and, therefore, for purposes of this appeal, we will apply I.C. § 13–7–20–19 and not I.C. § 13–23–13–2.

(3) the cost of corrective action at the site of the underground storage tank exceeds the amount of financial responsibility required under sections 13(6), 15, and 16 of this chapter and, considering the class or category of underground storage tank from which the release occurred, expenditures by the state are necessary to ensure an effective corrective action; or

(4) the owner operator of the underground storage tank has failed or refused to comply with an order of the commissioner or a judgment of a court of competent jurisdiction under subsection (a) to take corrective action with respect to the release.

Mini–Mart argues that I.C. § 13–7–20–19(b)(1)–(3) should be read in the conjunctive, while IDEM argues that I.C. § 13–7–20–19(b)(1)–(4) should be read in the disjunctive. Specifically, the issue is whether IDEM must show that sections (1), (2), and (3) or (4) exist or only that any one of (1), (2), (3), and (4) exist to support taking corrective action.

 Because we will be analyzing I.C. § 13–7–20–19(b), a brief review of our rules of statutory construction is necessary to our analysis of this case. The cardinal rule of statutory construction is to ascertain the intent of the legislature by giving effect to the ordinary and plain meaning of the language used. *T.W. Thom Const., Inc. v. City of Jeffersonville,* 721 N.E.2d 319, 324 (Ind.Ct.App.1999). Accordingly, if the language of a statute is clear and unambiguous, it is not subject to judicial interpretation. *State v. Rans,* 739 N.E.2d 164, 166 (Ind.Ct.App.2000), *trans. denied.* However, when the language is reasonably susceptible to more than one construction, we must construe the statute to determine the apparent legislative intent. *Id.* Statutory provisions cannot be read standing alone; instead, they must be construed in light of the entire act of which they are a part. *Deaton v. City of Greenwood,* 582 N.E.2d 882, 885 (Ind.Ct.App.1991). In addition, the interpretation of a statute is a question of law reserved for the courts. *Id.* We review questions of law under a de novo standard and owe no deference to a trial court's legal conclusions. *Id.*

 "[T]he words 'and' and 'or' as used in statutes are not interchangeable, being strictly of a conjunctive and disjunctive nature respectively, and their ordinary meaning should be followed if it does not render the sense of the statute dubious." *Sekerez v. Youngstown Sheet & Tube Co.,* 166 Ind.App. 563, 567, 337 N.E.2d 521, 524 (1975) (quoting 82 C.J.S. *Statutes* § 335). "And" is defined as "a function word to indicate connection or addition especially of items within the same class or type; used to join sentence elements of the same grammatical rank or function." MERRIAM-WEBSTER ONLINE, *at* http://www.merriam-webster.com (last visited March 9, 2004). "Or" is defined as "a function word to indicate an alternative, the equivalent or substitutive character of two words or phrases, or approximation or uncertainty." MERRIAM-WEBSTER ONLINE, *at* http://www.merriam-webster.com (last visited March 9, 2004).

Here, the word "or" appears after I.C. § 13–7–20–19(b)(3). As previously mentioned, the words "or" and "and" are not interchangeable, and when performing statutory construction, we must give these terms their plain and ordinary meaning. The parties do not dispute that because the legislature inserted the word "or" after subsection three, subsections three and four are written in the disjunctive. However, the parties disagree about whether the legislature intended to draft subsections one through three in the disjunctive. Mini–Mart argues, "[t]he mere existence of 'or' between the last two subordinate

clauses cannot be taken to be conclusive evidence that the legislature intended all subordinate clauses to read in the disjunctive." Appellant's Brief at 14 (citing *U.S. v. Vickery,* 199 F.Supp.2d 1363, 1367 (N.D.Ga.2002)). However, IDEM insists, "there is no logical reason why the legislature would have intended the disjunctive only to apply as between the last two conditions but not with respect to the first two conditions." Appellee's Brief at 8. We agree. Even though the legislature only placed an "or" after I.C. § 13–7–20–19(b)(3) and not the other subsections, after a careful reading of I.C. § 13–7–20–19(b), we conclude that any one of the scenarios identified in subsections one through four would provide an appropriate basis for the commissioner taking action. Each would exist without any of the others and each describes a circumstance in which action by the commissioner would be consistent with the purposes of the legislation. Moreover, when a series of items are presented in the form of a list and the only conjunction used is an "or" between the last two items, all of the items should be read disjunctively. *See* C. Dallas Sands, 1A SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 21.14 (4th ed.1973); *Rose v. U.S. Postal Service,* 774 F.2d 1355, 1360–1361 n. 14 (9th Cir.1984). Thus, we conclude that the legislature drafted I.C. § 13–7–20–19(b) in the disjunctive, and, therefore, IDEM must satisfy only one of the four subsections in order to undertake corrective action.

This conclusion is consistent with our legislature's 1996 revision and repeal of I.C. § 13–7–20–19. In 1996, the legislature repealed Title 13, including I.C. § 13–7–20–19(b), which was recodified at Ind.Code § 13–23–13–2 (1998). "While it is true that where the legislature amends a statute, it is presumed that it intended to change its meaning, this presumption will not apply if it appears that the amendment was made only to express the original intention of the legislature more clearly." *Med. Disposal Servs., Inc. v. Ind. Dept. Envtl. Mgmt.,* 669 N.E.2d 1054, 1058 (Ind. Ct.App.1996), *reh'g denied, trans. denied.* Here, the legislature expressed its intention for the 1996 recodification, providing:

> The purpose of the recodification act of the 1996 regular session of the general assembly is to recodify prior environmental law in a style that is clear, concise, and easy to interpret and apply. Except to the extent that:
>
> (1) the recodification act of the 1996 regular session of the general assembly is amended to reflect the changes made in a provision of another bill that adds to, amends, or repeals a provision in the recodification act of the 1996 regular session of the general assembly; or
>
> (2) the minutes of meetings of the code revision commission during 1995 expressly indicate a different purpose;
>
> the substantive operation and effect of the prior environmental law continue uninterrupted as if the recodification act of the 1996 regular session of the general assembly had not been enacted.

Ind.Code § 13–12–1–1 (1998). Accordingly, the legislature's repeal and recodification of Title 13 did not affect a substantive change on the law unless the language of the statute fell into one of the two exceptions identified in I.C. § 13–12–1–1. Further, Ind.Code § 13–12–1–4 (1998) also addressed the effect of recodification by the 1996 regular session of the general assembly and provides:

> The recodification act of the 1996 regular session of the general assembly shall be construed as a recodification of prior environmental law. Except as provided in section 1(1) and 1(2) of this chapter, if

the literal meaning of the recodification act of the 1996 regular session of the general assembly would result in a substantive change in the prior environmental law, the difference shall be construed as a typographical, spelling, or other clerical error that must be corrected by:

(1) inserting, deleting, or substituting words, punctuation, or other matters of style in the recodification act of the 1996 regular session of the general assembly; and

(2) using any other rule of statutory construction;

as necessary or appropriate to apply the recodification act of the 1996 regular session of the general assembly in a manner that does not result in a substantive change in the law. The principle of statutory construction that a court must apply the literal meaning of an act if the literal meaning of the act is unambiguous does not apply to the recodification act of the 1996 regular session of the general assembly to the extent that the recodification act of the 1996 regular session of the general assembly is not substantively identical to the prior environmental law.

Here, once more, the legislature clarified its intention regarding the 1996 recodification as one of clarification only, unless the language fell into one of two exceptions, neither of which is relevant to the matter at hand.

As previously mentioned, I.C. § 13–7–20–19(b) was recodified at I.C. § 13–23–13–2, and based upon the expressed intention of the legislature, the substantive law previously found in I.C. § 13–7–20–19(b) is identical to the substantive law found in I.C. § 13–23–13–2. *See* I.C. § 13–12–1–1;

I.C. § 13–12–1–4. In 1990, I.C. § 13–7–20–19(b) provided, in part, that:

> The commissioner, under rules adopted under section 13 of this chapter, may undertake corrective action with respect to any release of a regulated substance into the environment from an underground storage tank if that action is necessary, in the judgment of the commissioner, to protect human health and the environment, and . . .

The parallel language in I.C. § 13–23–13–2, provides, in part, that:

> The commissioner, under rules adopted under IC 13–23–1–2, may undertake corrective action with respect to any release of a regulated substance into the environment from an underground storage tank if:
>
> (1) that action is necessary, in the judgment of the commissioner, to protect human health and the environment; and
>
> (2) *at least one (1) of the following conditions exists:* . . . .

(emphasis added).[4] The four subsections identified in I.C. § 13–7–20–19(b) are nearly identical to the four subsections identified in I.C. § 13–23–13–2.

Mini–Mart suggests that the 1996 recodification "changed the language of the statute to indicate that only one of the elements enumerated in subsection one through three needed to be satisfied before IDEM could undertake corrective action," and when an "amendment to [a] statute changes the wording of a statute, a presumption arises that the legislature intended to change the law unless it clearly appears that the amendment was made to clarify the meaning of the original statute." Appellant's Brief at 15–16. IDEM argues that the recodification of Title 13 is merely

---

4. We note that I.C. § 13–7–20–19(b) was amended in 1995. However, the 1995 amendment did not modify any language, which is relevant to our consideration of this matter. *See* Pub.L. No. 173–1995, § 3 (effective date July 1, 1995).

a clarification of the legislature's original intent and is not a change in the law. In support of its argument, IDEM points to I.C. § 13–12–1–1 and I.C. § 13–12–1–4, which it argues explicitly provide that the legislature intended the 1996 recodification to be a clarification of existing law.

Based upon our review of I.C. § 13–7–20–19(b) and I.C. § 13–23–13–2, together with our consideration of I.C. § 13–12–1–1 and I.C. § 13–12–1–4, we conclude that the 1996 recodification merely clarified, not changed, the existing law. Although, here, the legislature changed the wording of I.C. § 13–7–20–19(b), and a change to the wording of a statute raises the presumption that the legislature intended to change the law, there is no such presumption when the legislature clearly provides that it amended the statute in order to clarify the meaning of the original statute. Here, in I.C. § 13–12–1–1 and I.C. § 13–12–1–4, the legislature expressly provided that the recodification was intended as clarification. Thus, the recodification of I.C. § 13–7–20–19(b) expressed more clearly the legislature's original intention, i.e., that subsections one through four be read in the disjunctive. As such, the trial court did not err by concluding that I.C. § 13–7–20–19(b) should be read in the disjunctive, and IDEM was required to satisfy only one of the four subsections listed in I.C. § 13–7–20–19(b) before it could seek recovery of its actual clean-up costs from Mini–Mart.

**B.**

The next issue is whether the trial court erred by concluding that there were no genuine issues of material fact with regard to whether IDEM had satisfied at least one of the four subsections found in I.C. § 13–7–20–19(b). Because IDEM must only establish that it has satisfied one of the four subsections of I.C. § 13–7–20–19(b), we will first address whether IDEM satisfied I.C. § 13–7–20–19(b)(2), which provided that the commissioner may undertake corrective action if "an existing situation requires prompt action by the commissioner under this subsection to protect human health and the environment."

▬▬▬ Mini–Mart argues that "IDEM justifies its hasty decision by arguing that the explosion levels in the homes created an emergency situation that required prompt action yet, there is no field data in the IDEM file that indicates that explosive environments existed." Appellant's Brief at 20.[5] IDEM argues that its Emergency Response Section responded to reports of explosive vapors in Homeowners' residences, and the "presence of gasoline fumes in a residence creates a risk to human health and the environment that requires prompt action." Appellee's Brief at 12.

▬▬ Our review of the record reveals that, in 1990, IDEM's Emergency Response Section responded to reports of "explosive vapors or fumes" at Homeowners' residences. Appellant's Appendix

---

**5.** Mini–Mart's relies upon the affidavit of Mark DeTroy. DeTroy's affidavit was not designated to the trial court when Mini–Mart filed its response to IDEM's motion for summary judgment, and, at the summary judgment hearing, Mini–Mart asked the trial court to deem the affidavit to have been timely submitted in opposition to IDEM's summary judgment. The trial court never ruled on the issue. When reviewing a motion for summary judgment, we may only consider that evidence which has been specifically designated to the trial court. *J.C. Spence & Assocs., Inc. v. Geary*, 712 N.E.2d 1099, 1102 (Ind.Ct. App.1999). Because the trial court never ruled on whether it considered the affidavit as properly designated, we will not consider the affidavit on appeal. Moreover, the affidavit does not create a genuine issue of material fact with regard to whether the situation required prompt action in order to protect human health and the environment.

at 59. The Homeowners were ordered to evacuate their residences and NIPSCO shut off Homeowner's utilities. IDEM installed seven monitoring wells on the Gas Station property, and three of the seven wells revealed a significant amount of contamination as well as strong odors of petroleum. Stevens, the Project Manager at the Gas Station site from 1990–1992, contacted Owner and told him that the Gas Station was the source of the contamination. Although the Final Emergency Incident Report completed on February 22, 1990 indicates that testing "displayed no immediate threat," in March 1990, Stevens said, "[w]e felt at IDEM that this problem warranted emergency action, urgent action, to protect the residents of the two homes." *Id.* at 83.

Further, Roy Harbert, Project Manager at the Gas Station site beginning in 1992, stated in an affidavit, "the gasoline in the groundwater caused vapor problems in the homes downgradient from the [Gas Station]. Vapor and vapor problems tend to fluctuate in cycles relating to weather, climate, barometric pressure, freezing of ground surfaces, moisture content, and the routes of least resistance for the vapors to emerge and cause problems." Appellant's Appendix at 195. Harbert also noted:

> Where gasoline vapors impact private residences, the IDEM emergency Response branch and/or the LUST branch will respond to the human health threats. Regarding the [Gas Station] in 1991, the fact that the residences were being evacuated and that NIPSCO was shutting off all utilities reflects the very real explosion hazard posed by the release of gasoline from [the Gas Station].

*Id.* at 196 (citations omitted). Harbert also discussed IDEM's corrective action measures, noting:

> Vent fans are a common method to reduce vapors inside a home. In 1991, the

department installed vents and sealed sump pumps in the basements of the Workman and Duff homes. These measures were installed in the homes to prevent gasoline vapors from building up in the basements, and to prevent additional sources of fire or sparks, thus eliminating the fire or explosion hazard posed by the gasoline vapors.

*Id.* at 196 (citations omitted).

Based upon our review of the record, we conclude that there is no question of material fact with regard to whether IDEM satisfied I.C. § 13–7–20–19(b)(2). The contamination caused by the Gas Station was producing dangerous, potentially explosive vapors in Homeowners' residence. In fact, the vapors were so potentially dangerous that, initially, IDEM ordered that Homeowners be evacuated from their residence and that NIPSCO shut off all utilities to the residences. Moreover, after a thorough investigation of the contaminated site, Stevens concluded that the "problem warranted emergency action, urgent action, to protect the residents of the two homes." *Id.* at 83. Therefore, because IDEM satisfied one of the four subsections identified in I.C. § 13–7–20–19(b), it properly undertook corrective action and is entitled to seek recovery of actual costs from Mini–Mart.

In summary, we hold that the trial court did not err by concluding that I.C. § 13–7–20–19(b) should be read in the disjunctive and that IDEM was required to satisfy only one of the four subsections listed in I.C. § 13–7–20–19(b) before it could seek recovery of its actual costs from Mini–Mart. We also hold that there is no genuine issue of material fact with regard to whether IDEM satisfied I.C. § 13–7–20–19(b)(2). Because IDEM is only required to satisfy one of the four subsections in I.C. § 13–7–20–19(b), and we hold that it did satisfy I.C. § 13–7–20–19(b)(2), IDEM

properly undertook corrective action and is entitled to seek recovery of actual costs from Mini–Mart. Therefore, the trial court did not err by granting IDEM's motion for summary judgment.

For the forgoing reasons, we affirm the judgment of the trial court.

Affirmed.

MATHIAS, J., and VAIDIK, J., concur.